## NORTHERN PAC. TERMINAL CO. OF OREGON v. SPOKANE, P. & S. RY. *

### No. 7771.

Circuit Court of Appeals, Ninth Circuit.
Nov. 12, 1935.

*Rehearing denied Jan. 13, 1936.

774

John F. Reilly and James G. Wilson, both of Portland, Or., for appellant.

Charles A. Hart, of Portland, Or. (Carey, Hart, Spencer & McCulloch, of Portland, Or., of counsel), for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

This is an appeal from a judgment in plaintiff's favor for moneys paid defendant under an alleged mistaken ·belief that defendant was a participating carrier with plaintiff in the movement of certain cars of fuel oil and therefore entitled to a division of the tariff charged.

Both plaintiff and defendant are common carriers by rail, the defendant maintaining several miles of railroad as a terminal in Portland, Or., known as the Portland switching district.· The published tariff approved by both parties and others divided this district into seven zones.

Defendant purchased fuel oil from the Standard Oil Company f. o. b. at defendant's fuel oil spur, Guild's Lake, Portland. The oil was consigned to defendant at "Guild's Lake" and delivered to plaintiff at Willbridge for carrier transportation. Both points known as Guild's Lake and Willbridge are within the same zone in the Portland switching district. At Guild's Lake there was an interchange track connecting lines of plaintiff and defendant.

The shipments began to move on February 1, 1923. Plainitff delivered the cars to defendant on the interchange track at Guild's Lake, from which track the defendant then transported the cars on the fuel oil spur to its unloading tank, the final destination, there unloaded the cars, and returned them to plaintiff at the interchange track. The unloading tank, although being about a half mile from the interchange track, is included in the territory of the district known as Guild's Lake, and is included with Guild's Lake, Willbridge, and the interchange track in the same zone.

The transportation charges from Willbridge for all the oil consigned to defendant by the Standard Oil Company were paid by the latter to plaintiff. Plaintiff retained all the charges for transportation prior to April 1, 1929. On August 18, 1926, defendant wrote plaintiff asserting that defendant was entitled to one-half of said charges because it participated in the movement of the oil to its final destination. The assertion was denied by plaintiff in a letter dated August 26, 1926. Subsequently, on November 24, 1926, plaintiff wrote to its attorney for an opinion as to whether or not revenues, received by it from another carrier for shipments handled by plaintiff under somewhat like circumstances, should be divided by plaintiff and such other ·carrier. However, plaintiff did not in such letter state how such shipments were billed or consigned. On November 30, 1926, the attorneys advised plaintiff that the revenue referred to in said letter should be divided, and that such division was proper where the shipments were consigned to their actual destination and the movement participated in by the two carriers.

No division of revenues for the transportation of the fuel was allowed by plaintiff to defendant except for shipments moving after April 1, 1929, when plaintiff began to divide the revenues with defendant.

All fuel oil was shipped from Willbridge by the Standard Oil Company until January 4, 1930, when defendant purchased its oil from the Richfield Oil Company f.o.b. Linnton, which is another point included in the same zone in which Willbridge and Guild's Lake and the interchange track are included. Consignments at Linnton were to defendant at "Guild's Lake" and plaintiff continued to divide the revenues with defendant on these shipments.

Both plaintiff and defendant are parties to the Portland district switching tariff, and under agreement between all parties to this tariff it is provided that the revenue shall be equally divided between the carriers participating in the transportation.

Plaintiff sued to recover the amounts received by defendant as a division of the revenues for the shipments moving after April 1, 1929, and defendant by way of counterclaim sought to recover one-half of the revenues for the shipments moving prior to April 1, 1929.

Defendant contends a division of the tariff rates should be required, first, because it was a participating carrier with plaintiff in the movement of the shipments, and, second, because plaintiff is estopped to claim that defendant is not entitled to participation in the revenues.

It does not appear from the record before us whether or not the agreement, admitted by both parties as to the division of tariff rates between the carriers, was in writing. If so, the actual agreement, as evidenced by such writing, might contain such language as would have a great deal of weight in considering the question as to whether or not the defendant was a participating carrier.

At the outset, there is no reason why defendant should not be entitled to share the revenues with plaintiff, if defendant was a participating carrier as prescribed by the agreement. Such a division would be in conformity with the terms of the contract and is lawful. Tuckerton R. Co. v. Pennsylvania R. Co., 52 I. C. C. 319; Rates on Railroad Fuel and Other Coal, 36 I. C. C. 1.

Defendant contends that it was a participating carrier in the movement of the shipments because the billing or consignment thereof, whether to "the unloading station at Guild's Lake" or to "Guild's Lake," was not a material factor, but that the intention as it was carried out determined the nature of the movement, since plaintiff had knowledge of defendant's intention and of the fact that defendant actually moved the shipments from the interchange track to its unloading tank, and there unloaded the cars. It is equally clear that plaintiff had knowledge of such intention and fact of unloading at said point at least after August 18, 1926, when defendant advised plaintiff of such intention and fact by letter. It has been held that the billing of a shipment does not determine the question as to whether such shipment is an interstate or intrastate movement. Baltimore & O. S. W. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 29, 67 L. Ed. 189; Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 37 S. Ct. 623, 61 L. Ed. 1181; Illinois Cent. R. Co. v. Fuentes and others constituting the Louisiana R. Comm., 236 U. S. 157, 35 S. Ct. 275, 59 L. Ed. 517; Rates on Railroad Fuel and Other Coal, 36 I. C. C. 1. It is said in all of the cases cited that whether traffic is interstate or intrastate depends on the essential nature of the movement.

Defendant contends that the rule as stated in Baltimore & O. S. W. R. Co. v. Settle, supra, that "the intention as carried out determined as matter of law the essential nature of the movement," should apply to this case, and since the intention was at all times to unload the fuel at the unloading tank, which intention was actually carried out, it is entitled to a division of the revenue. In Rates on Railroad Fuel and Other Coal, supra, 36 I. C. C. 1, page 9, it is said: "The railroad company as a shipper or consignee is entitled to the same consideration as any commercial shipper or consignee and no more, and this is true when the shipment moves partly over the rails of the carrier that is in fact the shipper or consignee." In this connection it should be kept in mind that the defendant in obtaining delivery of its fuel had the option either to take delivery of the fuel at the interchange track, and from there transport it to its unloading tank at its own expense, paying the first carrier the full rate to the interchange track, or it could take delivery of the fuel at its unloading tank, participate in the common carrier movement, and thereby obtain a division of the revenue. As the rate was the same, both to the interchange track and to the unloading tank, it would obviously be to defendant's advantage to exercise the latter option.

██ We believe the rule to be applied in this case is that the intention of the consignee as to where. the common carrier movement was to end, as actually carried out, determines whether or not the consignee was a participating carrier, but where, as in this case, the consignee has two options, it must clearly and timely indicate its intention and leave no room for doubt. In Baltimore & O. S. W. R. Co. v. Settle, 260 U. S. 166, 171, 43 S. Ct. 28, 30, 67 L. Ed. 189, it is said: "For neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk is an essential of a through interstate shipment. These are common incidents of a through shipment, and when the intention with which. a shipment was made is in issue, the presence, or absence, of one or all of these incidents may be important evidence bearing upon that question."

Of course, intention is a question of fact, but it is impossible to determine from the billing that the intention of defendant was that the shipments be delivered at the fuel tank, for the designation shown was merely "Guild's Lake," which might be either the interchange track or the unloading tank. If the consignee in this case had been an ordinary commercial consignee, the designation in the billing as "Guild's Lake" would undoubtedly mean the interchange track, for plaintiff had no right to move over defendant's tracks beyond the interchange track. Applying the rule quoted, supra, that defendant is entitled to the same consideration as any commercial shipper, we hold that the designation shown as "Guild's Lake" in the billing meant the interchange track at Guild's Lake.

The billing in this case becomes important evidence as to where defendant intended the common carrier movement to end, for the defendant could easily have prevented any uncertainty by requiring the billings to designate the unloading tank at Guild's Lake. Under the circumstances as here shown, it was defendant's duty to clearly indicate its intention as to where the common carrier transportation was to end, and not permit any speculation in this regard. The letters written by defendant to plaintiff clearly indicate its intention to unload the fuel at the unloading tank, but do not clearly evince an intention that the common carrier movement was to end at that place. The letters from de-fendant to plaintiff state that the fuel was unloaded at the unloading tank, and that defendant was transporting the same to that place. Neither fact is sufficient, for under either option which defendant had, such facts would be the same. The requests for a division of the charges in these letters would be some evidence as to defendant's intention with respect to termination of the common carrier movement, but that alone would be insufficient to clearly show its intention as might have been done in the billing.

The views herein expressed are entirely consonant with the holdings in Tuckerton R. Co. v. Pennsylvania R. Co., 52 I. C. C. 319, and In the Matter of Restricted Rates, 20 I. C. C. 426. In the former case, the consignee's intention as to where the common carrier movement was to end was clearly shown. The billing of the shipments was to a point on the consignee's line some seventeen miles beyond the junction of the two carriers. The case of Rates on Railroad Fuel and Other Coal, supra, cited by defendant, differs materially from the instant case as shown by the following quotation from Tuckerton R. Co. v. Pennsylvania R. Co., supra: "The facts in Rates on Railroad Fuel and other Coal, 36 I. C. C. 1, differed from those here considered in that there it abundantly appeared that the purchasing carriers were given abnormally and unreasonably high divisions of joint rates to points arbitrarily selected for that purpose and in that there was a practically complete identity of interests between the originating carrier and the producer and vendor of the coal." Where bad faith enters the controversy, such artifices as were there used will not be permitted to circumvent the law, nor can such decisions afford a convincing precedent.

██ Defendant makes one other contention with regard to this case, which is that since defendant's claim was rejected in 1926 because allowance of the claim would have been a form of rebating, plaintiff should not now be permitted to change its position and to recover on the ground that the billing was insufficient, and cites on this principle of estoppel Ohio & M. Ry. Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Davis v. Wakelee, 156 U. S. 680, 15 S. Ct. 555, 39 L. Ed. 578; and others. We see no merit in this reasoning, because the contention that a division of the revenues would be a form of rebating is mere-

ly a conclusion based on the rule of law that the intention of the consignee, as to what point the common carrier movement is to end, must be clearly shown. The claim that the billing was insufficient is also in accord with the rule just stated, because it is merely evidence of what defendant's intention was in this controversy.

Affirmed.